UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
AVARA PHARMACEUTICAL SERVICES, LTD.;
AVARA HOLDINGS, LTD.; AVARA PHARMACEUTICAL
TECHNOLOGIES, INC.; AND ALLIANCE
MANUFACTURING AND TRADING COMPANY, LTD.

                           *Plaintiffs*,

    -against-                                   Case No.

JPMORGAN CHASE BANK, N.A.

                           *Defendant*.
-------------------------------------------------------------------------------X

## COMPLAINT

      Plaintiffs,[1] by their undersigned counsel, for their Complaint against defendant JPMorgan Chase Bank, N.A., allege as follows:

## INTRODUCTION

      1.    Plaintiff Avara is a multinational contract manufacturer of world-class pharmaceuticals for many of the leading pharmaceutical companies.   It brings this action against Defendant JPMorgan Chase Bank, N.A. ("JPM" or the "Bank") for the latter's breach of a $25 million loan and credit agreement with Avara ("the "Loan Agreement") and related wrongdoing that has severely damaged Avara and caused unnecessary harm to its business operations. Specifically, JPM refused to exercise collection rights it had on secured assets of an Avara subsidiary in England named Avara Avlon Pharmaceutical Services Ltd. ("Avlon"), a pharmaceutical manufacturing facility in Bristol, England, that would have substantially reduced the amounts allegedly owed the Bank.  Instead, for two years, JPM equivocated and stonewalled—

---

[1] Avara Pharmaceutical Services Ltd. ("Avara Pharmaceutical"), Avara Holdings Ltd. ("Avara Holdings)," Avara Pharmaceutical Technologies, Inc. ("Avara Norman, collectively "Avara") and Alliance Manufacturing and Trading Company Ltd. ("AMTC") (collectively with Avara, "Plaintiffs").

most notably by repeatedly refusing to share a legal opinion (the "QC Opinion") obtained by the Joint Administrators of Avlon (the "JAs" or "Rubin") on which JPM's decision to abandon its secured position was apparently predicated—while using the uncertainty it created as negotiating leverage over Avara.

2.      As a result of JPM's failure to enforce its lien rights in Avlon, millions of dollars of the Avlon assets were irreparably eroded.  Even after those losses are accounted for, however, there remains over $8 million dollars in cash available in England that JPM can take to pay down the Avara loan.

3.      For almost two years, JPM insisted that Avara execute extension agreements on the payment of full principal of the original loan amount *plus* continuously accruing fees and interest, all the while refusing to avail itself of the Avlon cash proceeds.  Avara continued to push JPM to avail itself of the cash at Avlon, while Avara negotiated terms for a new extension of its loan from JPM.

4.      In November of 2021, JPM sent an offer for extension on the eve of the maturity date and inexplicably put Avara into default the very next day.  Even after this gambit, Avara continued to act in good faith, hiring multiple professional firms as JPM came back to the negotiating table for a new agreement.  Avara finally agreed to all of JPM's terms, asking only that JPM assert its claims in England or sell those claims to Avara.   JPM flatly refused to do so and, in retaliation, JPM filed a complaint against Avara in Oklahoma seeking, *inter alia*, the drastic remedies of appointment of a Receiver and foreclosure of Avara's profitable Norman, Oklahoma, manufacturing plant with 191 employees and a history of successful continuous operation.

5.      Based on JPM's actions, there are serious questions about the amounts currently owed JPM by Avara, if any, as a result of this misconduct.  In fact, JPM has tacitly admitted that

its earlier position regarding the Avlon collateral was a grave error, as the Bank has now **reversed its position regarding the Avlon assets** and filed a $23,025,000 claim with the JAs (a fact that it did not disclose to the Oklahoma court).

6.      Unless the Receivership effort is enjoined, Avara will suffer irreparable harm that threatens its existence and renders any relief it could receive on its claims in this Court moot.  JPM on the other hand, will suffer no harm as it is abundantly secured.

7.      In short, JPM has made the choice to maliciously pursue foreclosure of an operating business in the United States rather than satisfying its claim from the proceeds of a liquidating entity.  This action by JPM also threatens to destroy the perfected security interest plaintiff AMTC has over Avara Norman's assets in violation of the doctrine of equitable marshalling of assets.

8.      As a result, Avara brings claims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with business relations, declaratory judgment, tortious interference with a contract, and breach of the doctrine of equitable marshalling of assets.  In addition, Avara seeks injunctive relief to prevent JPM from proceeding with the Receivership action in Oklahoma in order to preserve the status quo during the pendency of this primary, overriding action.

## PARTIES

9.      Plaintiff Avara Pharmaceutical is a private limited company registered in England with a principal place of business at 9a Burroughs Gardens, London, NW4 4AU.

10.      Plaintiff Avara Holdings is a private limited company registered in England with a principal place of business at 9a Burroughs Gardens, London, NW4 4AU.

11.      Plaintiff Avara Norman is a Delaware corporation with a principal place of business located at 3300 Marshall Avenue, Norman, Oklahoma 73072.

12.     Plaintiff Alliance Manufacturing and Trading Company Ltd. is a private limited company registered in England with a principal place of business at 9a Burroughs Gardens, London, NW4 4AU.  It holds a $4,900,000 principal value (plus accrued interest), second lien, perfected secured note in Avara.  It has a perfected collateral security interest in all the assets of Avara's US-based subsidiaries, including Avara's assets in Norman, Oklahoma.

13.     Defendant JPMorgan Chase Bank, N.A. is a national banking association with a principal office located in Columbus, Ohio.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(3) as this is an action between citizens of different U.S. states in which citizens of foreign states are additional parties.

15.     This Court has personal jurisdiction over the parties by consent of the parties in the agreements underling this action.

16.     Venue is appropriate in this district pursuant to the 28 U.S.C. 1391(b)(2) as the negotiations and communications underlying this action substantially were sent from or received in this district.  The parties have also selected this venue in the agreements underlying this dispute.

## BACKGROUND

### The Avlon Facility

17.     Avara is a multinational pharmaceutical contract manufacturer that has consistently manufactured world-class pharmaceutical compounds and products for some of the world's largest pharmaceutical companies.  Avara has a number of subsidiaries, including Avara Norman, AIAC International Pharmaceutical LLC d/b/a Avara Arecibo, Avara Liscate Pharmaceutical Services S.p.A, Avara Aikin Pharmaceutical Services Inc., and Avara Pharmaceutical Services Inc.

(together, the "Avara Group"). The Avara Group produces critical, lifesaving prescription medications that are distributed internationally. For example, at the height of the COVID-19 pandemic, Avara Norman manufactured a pharmaceutical ingredient for Remdesivir, a leading treatment for the disease.

18.     In 2016, Avara created Avlon, another subsidiary, to acquire a pharmaceutical manufacturing facility in Bristol, England (the "Avlon Facility"). To that end, on December 5, 2016, Avlon purchased certain assets, including the Avlon Facility, from AstraZeneca, pursuant to their Asset Sale and Purchase Agreement dated August 26, 2016.

**The JPMorgan Loan**

19.     In 2018, to support the Avlon Facility and other facilities, Avlon's parent, Avara Holdings, approached JPM to secure a $25 million credit facility that Avara would use to ensure the Avlon Facility and other facilities had appropriate levels of operating capital.

20.     On May 25, 2018, JPM entered into a Loan and Security Agreement (the "Original Agreement") with Avara and Avara Holdings, and the loan was funded shortly thereafter.

21.     To secure the Original Agreement, Avara Holdings agreed that each subsidiary of Avara would give collateral assignment of all its assets to JPM.

22.     This collateral included JPM receiving a security interest in all the assets of Avlon, including the Avlon Facility. As a subsidiary of Avara, Avlon directly benefited from the liquidity and access to credit provided by the Original Agreement. Indeed, this allowed Avara Holdings, as parent, to assess the operating capital needs of each of its subsidiaries, including Avlon, and direct the cash proceeds from the credit facility as appropriate. This ability to allocate borrowed funds as needed is why each subsidiary pledged its assets as collateral and executed the Original Agreement, as each subsidiary benefited from the JPM credit facility.

23.     Consistent with this rationale, on May 25, 2018, Avlon granted JPM a debenture, which was registered with Companies House on June 4, 2018.[2]  The debenture included a "fixed charge" over certain parts of the Avlon Facility as well as a "floating charge" over the entirety of Avlon's business assets.

24.     Under English law, a "fixed charge" is a security interest that attaches immediately to the charged asset providing that the asset is, or is capable of being, ascertained and definite. For example, this could be a mortgage secured by a person's house.  A "floating charge" is a security interest that hovers above a shifting pool of assets. It is a charge on a class of assets, present and future, belonging to a chargor. That class of assets is one which, in the ordinary course of the chargor's business, changes from time to time and can include the inventory and machinery of a business. A floating charge can convert, or crystallize, into a fixed charge if certain events occur, such as the chargor defaulting on its repayment obligations to the chargee.  At that point, the value of the floating charge can be determined.

**Avlon Enters Administration**

25.     In 2018, AstraZeneca terminated a major supply agreement with Avlon that was the source of Avlon's revenue.  Accordingly, in late 2018, Avlon began to explore the possibility of entering administration under English law to orderly pay its creditors, most notably JPM—Avlon's largest creditor and *only* secured creditor.

26.     On February 13, 2019, pursuant to the relevant provisions of English insolvency law, David Rubin and Asher Miller (both licensed insolvency practitioners) were appointed as the

---

[2] Companies House is an executive agency in the United Kingdom whose responsibilities included incorporating and dissolving limited companies as well as storing public information about companies.

Joint Administrators.  On February 18, 2021, the administration was converted to a liquidation and the same two insolvency practitioners were appointed as the Joint Liquidators of Avlon.[3]

27.     The site of the Avlon Facility was, and is, highly valuable real estate.  The Avlon Facility, located approximately 120 miles from London, is comprised of nearly 100 acres, including 34.4 acres of undeveloped land.  The site is adjacent to 3 major highways and a busy shipping port; is directly adjacent to enormous, modern logistics buildings owned and occupied by a collection of blue-chip tenants such as Amazon, DHL, Tesco Supermarkets, and the Royal Mail (equivalent to the U.S. Postal Service), among others; and sits on the major logistics and distribution hub for southwest England.  This critically important logistics center serves the greater London metropolitan area.  In addition, the site has a long and successful history as a manufacturing and supply site.  The full range of facilities on the site included five large-scale pharmaceutical plants, two large-scale milling facilities, and large-scale laboratory areas.  All these factors combined to make the Avlon Facility an exceptionally attractive investment for real estate developers, manufacturers, and other businesses.

28.     Confirming the exceptional value of the Avlon Facility, in Rubin's Report and Statement of Formal Proposals dated March 29, 2019, as required under English insolvency law and for the benefit of Avlon's creditors, Rubin stated that it had been advised that the Avlon Facility had a value of up to £25 million—over $32 million at then-prevalent exchange rates.  In other words, the value of the Avlon Facility alone far exceeded the $25 million credit facility.  Avara thus reasonably believed that once JPM asserted its claims, the balance due under the Original

---

[3] Miller was Rubin's partner in David Rubin & Partners Ltd., which was sold in March 2021 to Begbies Traynor Group listed on the London Stock Exchange.  Rubin and Miller's colleagues on the Avlon matter included David Stephenson and Michael Ginty.  References to Rubin or the JAs herein generally apply to these other affiliated parties which managed the administration or liquidation of Avlon or employed those that did.

Agreement would be reduced to zero or near-zero.  A copy of the April 3, 2019 report is attached as Exhibit A.

29.     JPM knew, or should have known, that the Avlon Facility was exceptionally valuable, as the company hired to market the Avlon Facility site and other assets in 2019 reported to Avara and JPM that it received "daily" inquiries from parties considering acquiring the land to redevelop.

**JPM Second-Guesses Its Own Security Interest**

30.     Between February and August 2019, Rubin obtained what is known as a Queen's Counsel Opinion (the "QC Opinion") prepared by Andrew Ayres QC ("Ayres").  Ayres is a member of Twenty Essex, a prominent set of London-based barristers who practice English law with a specialty in secured lending and restricting transactions.[4]

31.     According to Rubin's first Progress Report, dated September 11, 2019, in the QC Opinion Ayres provided "a very firm opinion that JPM's floating charge was invalid."  Rubin accordingly advised Avara that JPM did not, in fact, have a secured interest in Avlon's collateral.

32.     Rubin failed to provide a copy of the QC Opinion to Avara or expound upon the rationale for determining that JPM was not a secured creditor—which was particularly odd, given that the Original Agreement made JPM's status as a secured creditor crystal clear, and given the robust, lengthy and detailed documentation JPM filed in England in May 2018 to secure that collateral.

33.     Further, Rubin's position in the first Progress Report directly contradicted his own representations from just two months earlier.  In July 2019, the JAs entered into a bridge loan agreement with GQS Finance Ltd. ("GQS") to obtain working capital necessary to perform

---

[4] Ayers is now known as "Andrew Ayres KC" which stands for "King's Counsel."  This change in title stems from the recent death of Queen Elizabeth II and the accession to the throne of King Charles III.

environmental remediation at the Avlon Facility in preparation for its sale.  Upon closing the bridge loan, the JAs recorded a deed to the benefit of GQS that defined "existing security" as "the debenture dated 25 May 2018 granted by the Chargor in favour of JP Morgan Chase Bank, N.A." The deed further provided that "[t]he chargor shall not create or permit to subsist, any security over any of the secured assets other than the existing security."  In other words, in July 2019 both JPM and Rubin took the position in a publicly recorded deed that JPM had a valid recorded security interest reflected in the debenture.

34.     In the JAs' second Progress Report, dated March 10, 2020 (the "Second Progress Report") and third Progress Report, dated September 2, 2020 (the "Third Progress Report"), Rubin stated that he intended to seek JPM's "agreement to withdraw *any claim that they have*" as to the assets of Avlon (emphasis added).  The progress reports further stated that the QC Opinion was shared with JPM "on terms agreed with their solicitors," even as Rubin continued to withhold it from Avara.

35.     JPM's claim represented, by far, the largest single claim against Avlon's assets as Avlon entered insolvency.  Thus, the validity of JPM's secured lien of Avlon assets was of paramount importance to Avara, and by extension, all of Avara's subsidiaries.  It was also of great financial significance to Avara's subordinated noteholders, second lien noteholder, suppliers, shareholders, customers, and employees.  All Avara's stakeholders stood to gain by JPM exercising their lien over Avlon.  And, of course, JPM would have been a great beneficiary had it exercised its liens.

36.     Without satisfying JPM's loan from the sale proceeds from the Avlon property, JPM's loan would remain outstanding and JPM could attempt to execute upon other assets of

Avara and its subsidiaries, including those necessary for the day-to-day operations of the businesses.

**The Avlon Facility Is Sold, and JPM Inexplicably Walks Away from Its Security**

37.     In or about May 2020, the JAs signed an agreement for sale of the Avlon Facility, along with certain equipment, for a total of £18.5 million ($25 million at then-prevalent exchange rates).  This agreement was reached a mere two months after the onset of the unprecedented global COVID-19 pandemic and the bottom of the market for commercial and industrial real estate. Indeed, given the uncertainty surrounding how long the COVID-19 pandemic might depress real estate values, continuing to search for a better sales price for even a few months would have likely netted millions of dollars more.  Based on a sale at or about June 2022 of an adjacent 70-acre site to Panattoni Development Company, a major global developer, for £1.2 million per acre, the 100-acre Avlon site today could be worth £120,000,000 ($139,200,000).  In May 2020, Rubin settled for a price of merely £16.5 million for the real estate and £2 million for the machinery assets, or a total of £18.5 million ($25 million at then prevalent forex values.)

38.     As of May 2020, JPM still had not filed anything to assert their claim over Avlon's assets.  To the great disbelief and frustration of Avara, JPM and Rubin thus allowed for the marketing and sale of Avlon assets without first establishing the identity of the senior creditor, leading to the erosion of millions of dollars of Avlon's collateral.

39.     With the closing date of the sale of the Avlon Facility property still months away, Avara extended the maturity date of its loan agreement with JPM in June 2020 (the "Amended Agreement").

40.     On December 17, 2020, Rubin closed on the sale of the Avlon Facility.  Seven days before, on December 10, 2020, JPM released various assets from its fixed charge on the Avlon

Facility—but ***not*** its floating charge on the assets of Avlon as a whole.  Miller, on behalf of the JAs, signed a Deed of Release countersigned by Linda Secka ("Authorized Officer") of JPM on that day.  Crucially, the JAs suggested the sale could not have gone through without JPM releasing its fixed charge.  However, JPM received no consideration, nor did it notice, consult with, or obtain consent from Avara.  JPM failed to ask for or receive even a single penny of the $25 million in cash proceeds from the sale on December 17, 2020, a baffling fact.  Nevertheless, JPM maintained it did nothing wrong.

41.    On February 19, 2021, ***after*** JPM executed the Deed of Release in relation to the Avlon Facility, JPM's counsel confirmed to the JAs that it would ***not*** be filing a Proof of Debt in the administration.  In other words, JPM would not be making a claim on Avlon's assets, thus releasing funds to be paid to other creditors.  In an email to an Avara representative on February 20, 2021, Rubin wrote: "On Friday, JPM confirmed through their lawyers that they won't be putting in a Proof of Debt."  Somehow, Rubin believed that "[t]his is great news and will now allow us to process the creditors' claims through the liquidation; pay the dividend and close the case," while seemingly ignoring the fact that Avara's debt to JPM was wholly unsatisfied.  A copy of Rubin's February 20, 2021 email is attached as Exhibit B.

42.    Had JPM asserted its claim, it could have had its loan to Avara nearly entirely satisfied from the proceeds of the sale of the Avlon Facility.  Further, the refusal of JPM to even assert a claim for the Avlon assets prohibited Avara from expeditiously finalizing a long-term credit agreement, as Avara did not understand what the remaining balance would be on the credit agreement.

43.    Indeed, JPM's refusal to be satisfied from the proceeds of the sale of the Avlon Facility was entirely contrary to Avara's rights under the loan agreement and expectations, as

Avara was understandably eager to see a substantial portion of its debt to JPM extinguished by the sale of its valuable English property and the collateral of Avara's other subsidiaries thus protected from foreclosure by JPM.

**JPM's Stonewalling Campaign**

44.     In August 2021, the maturity date for Avara's loan was extended again to November 30, 2021 by agreement (the "Second Amended Agreement").

45.     Throughout the negotiations and communications leading up to the Second Amended Agreement, Avara continued to press JPM to explain its seemingly inexplicable determination that it did not have a secured position in Avlon.  Indeed, Avara fully and reasonably expected that its liability under the Amended Agreements would be reduced by the amount of cash available to JPM from the sale of the Avlon Facility.

46.     JPM's answers were evasive.  Most pointedly, JPM refused to provide Avara with the QC Opinion that supposedly offered rock-solid reasoning that JPM did not have a valid floating charge on Avlon.

47.     To this day, Avara has not seen the QC Opinion on which JPM's fateful decision was apparently predicated.  However, upon information and belief, the QC Opinion is based on a factually inaccurate assessment that Avlon was insolvent as of May 25, 2018—well before the loss of the AstraZeneca contract that precipitated Avlon's administration.

48.     Moreover, the QC Opinion was sought by, and prepared for, Rubin—***not*** by or for JPM.  Upon information and belief, JPM has never retained or sought its own outside legal opinion regarding the validity of its lien against Avlon.  Indeed, as detailed below, JPM ***has now taken the position that the lien is valid*** by submitting a claim as a secured creditor in the liquidation.

49.     Still, throughout 2021, JPM persisted in its refusal to share the QC Opinion with Avara or to provide any other justification for its refusal to take "yes" for an answer and have its debt satisfied.  JPM knew that withholding this document and refusing to allow Avara access to the information was creating a situation wherein Avara simply could not defend the security on behalf of JPM, irreversibly eroding the collateral value.

50.     By November of 2021, Avara was again negotiating another credit extension with JPM as JPM still refused to assert a claim against the now, approximately, $8 million left from the sale of the Avlon Facility that remained available to satisfy its debt.  Given JPM's tactics to date, Avara was understandably reluctant to sign yet another unnecessary agreement for the full $25 million loan obligation, plus continuously accruing fees and interests, collateralized by all of the assets of Avara's subsidiaries.  In fact, throughout 2021 Avara repeatedly notified JPM that the Bank's refusal to assert a claim in Avlon would prohibit Avara from being able to sign a new credit agreement, as the final payoff was still unsettled.  Repeatedly, Avara offered to buy the claim in Avlon from JPM in order to settle the dispute—an offer JPM refused to consider.  In effect, JPM preferred to abandon and destroy $25 million in collateral security rather than sell it for anything to Avara or its affiliates.  JPM said, in essence, "We won't take it and you can't take it either.  We will obliterate it."

51.     On November 29, 2021, on the eve of the Second Amended Agreement's maturity date, JPM provided Avara with a proposed short-term amendment that would have extended the maturity date to March 31, 2022.  JPM thus offered Avara yet another agreement for the ***full*** principal amount, ***plus interest and fees***, without explaining its position with respect to the Avlon proceeds ***and*** with less than 24 hours to be finalized.

52.     The Second Amended Agreement thus matured on November 30, 2021.

**Avara and JPM Continue to Negotiate Terms Into 2022**

53.     JPM sent default notices to Avara and its junior creditors, AMTC and Hitachi in December 2021.

54.     Despite the default notice, Avara continued to negotiate with JPM to restructure the existing debt.  The negotiations continued to be stymied by JPM's ongoing refusal to apply the $8 million in Avlon sale proceeds to the debt.  During these discussions, Avara emphasized that it could not sign any restructuring agreement until JPM agreed to either (a) collect the cash proceeds of the sale of Avlon assets and correspondingly reduce Avara's debt to JPM; or (b) assign its claim over the collateral to Avara so that Avara could pursue the claim, collect the cash held in the estate of Avlon, and pay down the Avara loan.

55.     Avara also conveyed that had JPM earlier sought to enforce its secured lien over Avlon's assets, JPM would have received the entire proceeds of the sale of the Avlon Facility, largely, if not entirely, extinguishing the debt owed to JPM.  Instead, because JPM delayed and refused to assert its rights as a first priority secured creditor, Rubin's unbridled legal and administrative expenses severely eroded the cash from the Avlon accounts while the British Pound collapsed against the U.S. Dollar, greatly diminishing the sale proceeds from $25 million to $8 million.  JPM turned a blind eye to Rubin's fees, his counsel's fees, and the 35% interest rate charged by a bridge lender Rubin recruited and whose officers and directors were former clients of the JAs.

56.     Throughout the 2022 negotiations, the term on which the parties remained unable to reach resolution was whether JPM would either assert its claim in England for the Avlon assets or transfer the claim to Avara.  JPM refused both options.

57.     Moreover, at all times JPM had an operative Automated Clearing House ("ACH") System tied to the Avara operating account.  JPM ceased to sweep Avara's accounts for interest and principal in late 2021 or early 2022 as it negotiated with Avara.

58.     The only default that exists under the loan agreements is due to JPM's refusal to take a reasonable position with respect to the Avlon collateral while offering less than a day to accept the final, non-negotiable terms of a loan extension agreement.

59.     JPM's constant delay, placement of duress, and "take it or leave it" approach to loan negotiations have thus served no purpose other than to diminish the value of the Avlon collateral pledged to JPM.  On multiple occasions Avara expressed its frustration to JPM that the bank not only refused to enforce its secured lien, but also refused to work with Avara and act in a commercially reasonable manner.  Instead, in bad faith, JPM refused to discuss JPM's view on the enforceability of its secured lien over the Avlon assets with Avara, and again refused to even provide Avara with the QC Opinion upon which JPM relied to conclude that it did not have a valid, secured lien on the assets of Avlon.

60.     Through as recently as October 2022, Rubin and JPM have each steadfastly refused Avara's repeated requests for a copy of the QC Opinion.  To date, Avara has still not seen the document and does not understand the purported basis for any claim that JPM did not have a valid floating charge on Avlon's assets.  This, of course, assumes the QC Opinion made any such clear, unambiguous finding, which seems incredibly unlikely, given the express terms of the loan and security agreement which made JPM a senior secured perfected priority creditor and given the robust, lengthy, meticulously detailed security documents which JPM filed at Companies House in May 2018.

**Avara Learns the Truth, and JPM Escalates Its Tactics**

61.     While JPM continued to block Avara's reasonable requests to review the QC Opinion and/or otherwise receive detailed explanation or rationale as to why JPM did not believe it had a valid security interest in Avlon, Avara undertook an effort to independently understand JPM's positions and actions.

62.     On July 26, 2022, Avara's English counsel wrote to JPM detailing their findings: specifically, that they had fully researched the lien issue and concluded that JPM's floating charge (a) was secured, (b) was valid, (c) should have been asserted as early as December 2020, and (d) could still be asserted.

63.     JPM did not respond to Avara's English counsel.  Instead, on July 28, 2022, JPM sent Avara a draft forbearance agreement and represented that it was "non-negotiable."  This offer was as follows:  4 month maturity, base rate (30 day SOFR)[5] + 4.5% (10.75%), $1.5 million paydown of principal, payment of legal fees billed by Latham & Watkins, payment of a $300,000 "legal fee reserve" (also for Latham & Watkins).  And, of course, the offer required Avara to release JPM from any responsibilities with regard to collecting money from Avlon (and, for that matter Shannon, Ireland, where JPM also abandoned millions in collateral, without consultation or notice to Avara or consideration of any sort).  This "offer" had an interesting attachment:  a draft copy of a foreclosure action in Oklahoma.  JPM's blunt ultimatum was abundantly clear:  pay off your loan, pay all the Latham & Watkins legal fees, abandon at least $8 million in UK collateral, or we will kill your business.  Period.

64.     In response to the July 28 draft forbearance agreement, Avara informed JPM that it rejected the "take it or leave it" terms, but instead offered to execute an amendment extending the

[5] The Secured Overnight Financing Rate (SOFR) is a broad measure of the cost of borrowing cash overnight collateralized by Treasury securities.

loan by 18 months at the rate of 30-day SOFR + 2.50% provided that JPM claimed its interest over Avlon's assets or assigned that interest to Avara.

65.     JPM failed to respond to Avara's counterproposal.

**JPM Targets Avara Norman Facility in Oklahoma**

66.     On August 17, 2022, JPM filed a complaint in Oklahoma seeking to foreclose on the mortgage and security interest over Avara Norman's real property and assets and, incredibly, seeking to appoint a receiver over the well-managed and profitable Norman facility.  A copy of the amended complaint filed in Oklahoma is attached as Exhibit C.

67.     Less than one month later, on September 14, 2022, JPM filed a motion for expedited appointment of a receiver.  A copy of JPM's Motion to Appoint Expedited Receiver is attached as Exhibit D.

68.     Avara Norman is a professionally managed, solvent, operating business that has 191 employees, manufactures lifesaving pharmaceuticals, and has ample assets and revenue.

69.     Crucially, in addition to the $8 million *still available* to satisfy JPM from the Avlon Facility sale, JPM holds a security interest in Avara's other assets, which include as of October 26, 2022, $9,683,000 in cash; $20,900,000 in accounts receivable; and $20,935,000 in raw, work-in-process, and finished goods inventory.  JPM also holds a security interest in Avara's Oklahoma real property, which is valued at more than $34.7 million; Avara Norman's equipment, machinery, and other personal property, which has a fair market value in excess of $34.3 million; and $31.1 million in additional real estate and $7 million in equipment and machinery owned by other Avara subsidiaries.  Indeed, just the $8 million dollars in Avlon plus the $9,683,000 in cash reserves of the other subsidiaries would extinguish 81.6% of Avara's outstanding debt.

**JPM "Flip Flops" and Secretly Asserts its Claim in Avlon**

70.     JPM put its bad faith on full display when, on September 15, 2022—after maintaining for 3 years and 9 months that it somehow did not have a secured lien on the Avlon Facility and one day after moving the Oklahoma court to expedite appointment of a receiver over Avara Norman—JPM stunningly reversed course and submitted a $23,025,000 senior secured claim over Avlon.  Indeed, this is *precisely* what Avara had repeatedly pressed JPM to do for years, which would have largely, if not completely, satisfied JPM's debt and entirely avoided any colorable right by JPM to seek the extraordinary relief it now seeks in the Oklahoma proceeding.

71.     JPM took this action within *two months* of receiving Avara's analysis of the very same issue JPM had refused to discuss with Avara for years.  Moreover, this action puts the lie to any claim by JPM or Rubin that the QC Opinion conclusively demonstrated that JPM did not have a valid security interest.

72.     Further demonstrating its bad faith, JPM failed to notify either the Oklahoma court or Avara that JPM now believed it actually does have a secured interest in the Avlon Facility and that it had filed this claim.  Avara has repeatedly requested the $25 million claim document of JPM and Rubin.  Avara repeatedly told JPM and Rubin that it needed these documents because they were critically important to the Oklahoma litigation and that Avara intended to file them with the Court so the Court could make a reasonable decision on the case, based on all the relevant facts.  Rubin informed Avara that JPM would not allow the JAs to provide the claim document to Avara.

73.     In a final, ironic twist, it now appears that the QC Opinion on which JPM's entire course of conduct over the past 22 months has been predicated, is being called into question.  On October 4, 2022, counsel for the JAs stated as follows in a letter to Avara's counsel:

> By a letter dated 15 September 2022 from Latham & Watkins (London) LLP to us, JPM informed the Joint Liquidators that JPM has decided to pursue a secured

claim against the Company for Secured Obligations having (at that time) a value of $23,025,000.

In light of this development, the Joint Liquidators propose to *freshly adjudicate the validity of JPM's claim and security*.  This exercise will be undertaken with the benefit of professional legal advice from this firm and specialist counsel, and impartiality.

A copy of the October 4, 2022 letter is attached as Exhibit E (emphasis added).

### JPM's Actions Have Harmed, and Continue to Harm, Avara

74.      JPM's bad faith refusal to accept the Avlon Facility sale proceeds and commercially unreasonable efforts to collect this debt through improper means have significantly harmed Avara. JPM's refusal to timely assert a claim for Avlon's assets in the Administration—and repeated refusal to disclose the QC Opinion, in which JPM has apparently since lost faith—precluded Avara from being able to enter into a new loan agreement with JPM or otherwise refinance the debt, *as the parties could not even agree on how much was still owed.*

75.      JPM's refusal to assert its senior claim in England has permanently eroded millions of dollars in cash collateral through unnecessary legal fees, fees of the JAs, expensive bridge loans and currency exchange rate losses.   This is money that could have and should have been used to reduce the outstanding balance of the Avara credit facility.

76.      Indeed, if JPM's harassment and improper legal gamesmanship is allowed to continue unabated, Avara and Avara Norman will be permanently and irreparably harmed.  While Avara Norman is well managed and profitable, the appointment of a receiver would result in significant and needless expense, irreparably harm Avara's relationship with its customers, jeopardize its contracts with suppliers, and cripple its business—with no justification *and no corresponding benefit to JPM*, whose loan could have already been fully paid off or, at a bare

minimum, satisfied through collateralized assets that would not leave Avara and Avara Norman in a ruinous position.

77.    Notably, JPM's proposed receiver has no familiarity with the business and no experience operating or overseeing a pharmaceutical manufacturing facility, but *nonetheless charges the astronomical fee of $1,325 per hour*.  Additionally, JPM requests that the receiver be authorized to retain additional consultants and utilize his staff, at the same or similar rates.  The appointment of this receiver and two additional consultants at the same rate would, assuming a 40-hour work week, *needlessly drain Avara Norman of $7,632,000 per year*.

78.    Moreover, JPM's proposed foreclosure would shutter a successful manufacturing facility that has been operating for 40 years, eliminate 191 highly paid jobs, waste company assets, and destroy a business that produces lifesaving prescription medications.  It should be apparent that genuine concern for its collateral is not driving JPM's request for a receiver.  JPM's goal is not to "protect" Avara Norman's assets; it is to threaten Avara Norman with complete destruction in order to extort payment from Avara, and bury the facts demonstrating JPM's wrongdoing here.

## FIRST CAUSE OF ACTION
### Breach of Contract

79.    Plaintiffs re-allege and incorporate the allegations in Paragraphs 1-78 as if fully set forth herein.

80.    Avara and JPM entered into a valid contract through the Amended Agreement.

81.    Section 9.02(d) of the Amended Agreement provides that JPM, as the Administrative Agent, is authorized to release any Liens granted to JPM *only* under the following circumstances:

(i)    satisfaction of the Final Release Conditions;

(ii)     termination of all Commitments, payment and satisfaction in full in cash of all Secured Obligations… and the cash collateralization of all Unliquidated Obligations in a manner satisfactory to the Administrative Agent;

(iii)     constituting property being sold or disposed of (including in connection with the Avlon Sale or the Irish Sale) if [Avara] certifies to the Administrative Agent that the sale or disposition is made in compliance with the terms of [the Amended Agreement]…;

(iv)     constituting property leased to any Loan Party or any Subsidiary under a lease which has expired or been terminated in a transaction permitted under [the Amended Agreement]; [or]

(v)     as required to effect any sale or other disposition of such Collateral in connection with any exercise of remedies of the Administrative Agent and the Lenders….

82.     "Liens" as defined by the Amended Agreement include "any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge, fixed charge, floating charge, assignment by way of security or security interest in, on or of" any asset.

83.     JPM's fixed charge over the Avalon Facility was a "Lien" under the Amended Agreement.

84.     JPM's floating charge in Avlon's assets was a "lien" under the Amended Agreement.

85.     Not one of the conditions set forth in Paragraph 41 was met in December 2020 when JPM released its fixed charge without consideration or compensation or in February 2021 when JPM informed the JAs that it would not be filing a Proof of Debt in the Avlon liquidation.

86.     JPM thus breached the contract by releasing Liens in violation of the plain terms of the Amended Agreement.

87.     JMP's decision to release the fixed charge without consideration and not to pursue—and effectively release—the floating charge damaged Avara by diminishing the assets

available to pay the debt to JPM, damage that could not be undone by JPM's subsequent decision more than 18 months later to assert a secured claim in the liquidation.

88.     By reason of the foregoing, Plaintiffs are entitled to monetary damages in a sum to be determined at trial.  Plaintiffs are further entitled to a preliminary and permanent injunction including barring JPM from seeking the appointment of a receiver over the Avara Norman facility and seeking to foreclose on the Avara Norman facility.

### SECOND CAUSE OF ACTION
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

89.     Plaintiffs re-allege and incorporate the allegations in Paragraphs 1-88 as if fully set forth herein.

90.     The contract between Avara and JPM is governed by New York law and, therefore, includes an implied covenant of good faith and fair dealing.

91.     The covenant of good faith and fair dealing imposed a duty on JPM that, among other things, required JPM not to do anything to deprive Avara of the benefit of its contract with JPM.

92.     JPM breached this covenant by, without limitation:

(i)     Concealing, and withholding information about, JPM's decision not to assert a claim for the Avlon assets in a timely manner or at all, despite knowing that such information was relevant to Avara's decision to extend the terms of the Original Agreement;

(ii)    Concealing and refusing to prove the QC Opinion to Avara;

(iii)   Refusing to negotiate extension agreements in good faith;

(iv)    Forcing Avara into a default by refusing to negotiate extension agreements, refusing to diminish the loan balance by the cash collateral available to JPM, and allowing the full principal to continue accruing interest and fees while JPM delayed;

(v)      Refusing to either assert its claim in the Avlon collateral or assign the claim to Avara;

(vi)     Pursuing harassing and vexatious litigation, including the drastic measures of seeking Receivership and foreclosure of the thriving Norman facility, in order to enforce the loan terms; and

(vii)    Jeopardizing Avara as a going concern.

93.    JPM's breaches have had the effect of hindering and impeding Avara's ability to perform under the contract, destroying and/or severely injuring Avara's rights to receive the fruits of the contract, and has transformed this loan agreement from a mid-size credit facility that could have been paid back in the normal course to one that threatens the heart of Avara's operations.

94.    By reason of the foregoing, Plaintiffs are entitled to monetary damages in a sum to be determined at trial.  Plaintiffs are further entitled to a preliminary and permanent injunction barring JPM from seeking the appointment of a receiver over the Avara Norman facility and seeking to foreclose on the Avara Norman facility.

**THIRD CAUSE OF ACTION**
**Declaratory Judgment Pursuant to CPLR § 3001**

95.    Plaintiffs re-allege and incorporate the allegations in Paragraphs 1-94 as if fully set forth herein.

96.    Plaintiffs seek a declaratory judgment to resolve questions concerning the respective rights, obligations, and duties of Plaintiffs and Defendant under the Original Agreement, the Amended Agreement, and the Second Amended Agreement (together, the "Loan Agreements"), including JPM's rights to the assets of Avlon, its obligation to act in a commercially reasonable manner in satisfaction of its claims, and its right to attempt to foreclose under the Avara Norman facility and have a receiver appointed for the Avara Norman facility.

97.     As set forth above, an actual case or justiciable controversy exists between Plaintiffs and Defendant concerning the parties' rights and obligations under the Loan Agreements.

98.     Avara contends that JPM had, at all times, robust rights under its liens on the Avlon assets, as demonstrated by its lengthy, detailed, and meticulous debenture, which such rights they failed to exercise either at all or in a timely manner sufficient to realize its value.  Avara repeatedly implored JPM to exercise its rights over that collateral or, failing that, to assign its rights to Avara. JPM refused, causing consequential harm to Avara equal to the erosion in the value of that collateral, along with the interest and fees charged on loans outstanding to Avara which could have been repaid with the Avlon sale proceeds.  JPM's refusal threatens to further, and irreparably, damage Avara by destroying the value of its Avara Normal operation rather than collect assets readily available to it.

99.     By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment establishing the rights and obligations of the parties under the Loan Agreements.  Plaintiffs are further entitled to a preliminary and permanent injunction barring JPM from seeking the appointment of a receiver over the Avara Norman facility and seeking to foreclose on the Avara Norman facility.

### FOURTH CAUSE OF ACTION
**Breach of Duty of Equitable Marshalling (On Behalf of AMTC)**

100.     Plaintiffs re-allege and incorporate the allegations in Paragraphs 1-99 as if fully set forth herein.

101.     Plaintiff AMTC is a creditor of Avara.  It has a $4.9 million second lien note secured by the assets of Avara Norman.

102.     Defendant JPM is a creditor of Avara, holding as collateral under the terms of the Amended Agreement, a security interest in Avara, including the assets of Avara Norman.

103.     As a result of their respective security interests AMTC and JPM are creditors with a common debtor.

104.     Defendant JPM has a legal claim to recover from multiple sources of funds held by Avara, including (1) the assets of Avara Norman; (2) the assets of Avlon, (3) the assets of Avara Shannon, another dormant Avara subsidiary, and (4) various other assets of Avara.  AMTC, by contrast, only has a legal claim to recover its second lien debt from one source of funds held by Avara: (1) the assets of Avara Norman.

105.     JPM's decision to satisfy its claim by foreclosing on the assets of Avara Norman has damaged and will severely damage AMTC by impairing and/or eliminating the collateral securing AMTC's note.

106.     JPM's satisfaction of its claim from the Avlon assets (or any other readily available Avara assets) would not prejudice JPM or any third party or require any litigation to recover the funds.

107.     AMTC therefore seeks equitable relief requiring JPM to first satisfy its claim from the assets of Avlon before foreclosing any assets securing AMTC's claim.  Plaintiffs are further entitled to a preliminary and permanent injunction barring JPM from seeking the appointment of a receiver over the Avara Norman facility and seeking to foreclose on the Avara Norman facility.

**FIFTH CAUSE OF ACTION**
**Impairment of Security Interest (On Behalf of AMTC)**

108.     AMTC re-alleges and incorporate the allegations in Paragraphs 1-107 as if fully set forth herein.

109.     JPM acted wrongfully when it, without limitation:

    i.     conveyed to Rubin in February 2021 its intention not to pursue its floating charge in the Avlon assets, thereby freeing Rubin to

25

handle the insolvency proceedings as though JPM were not a creditor;

ii.      delayed for over 18 months before eventually filing a claim based on its floating charge, during which time the value of the British pound fell significantly and hampered JPM's ability to extract dollars against Avara's loan; and

iii.     by diminishing the value of the Avlon proceeds via the actions described at (i) and (ii), placed other Avara collateral at risk of foreclosure by JPM when such collateral could have been available to AMTC but for JPM's wrongful actions.

110.    By virtue of JPM's wrongful actions, the Avlon estate itself lost value that would otherwise have been guaranteed to JPM and would have been sufficient to largely, if not entirely, extinguish the debt to JPM.

111.    JPM's misconduct thus required JPM to seek satisfaction from assets beyond the Avlon estate, which would not have been necessary absent JPM's own actions.

112.    JPM is currently seeking to foreclose on the assets of Avara Norman, which would not be necessary absent JPM's wrongful acts.

113.    AMTC has a second priority secured claim on the assets of Avara Norman.

114.    JPM's wrongful conduct will impair and/or destroy the value of the collateral securing AMTC's claim.

115.    JPM is liable to AMTC for the impairment of AMTC's security interest in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs hereby request that the Court grant the following relief:

(1)    Aa preliminary and permanent injunction barring Defendant from pursuing its claims against Avara Norman, including seeking the appointment of a receiver over the Avara Norman facility and seeking to foreclose on the Avara Norman facility;

(2)    An award of damages, including, but not limited to, compensatory, consequential, punitive and exemplary damages, and lost profits, in an amount to be determined at trial;

(3)    A judgment declaring that JPM has a secured, priority claim to the assets of Avlon from which it can satisfy a significant portion of the debt owed to it and that, to satisfy its contractual and common law obligations, it must apply those assets to the debt before seeking satisfaction from other Avara assets.

(4)    An award of Plaintiffs' costs, disbursements and attorneys' fees incurred in prosecuting this action;

(5)    An award of pre- and post-judgment interest; and

(6)    Any and all other and further relief as the Court may deem just and prope

Dated: November 7, 2022
       New York, New York

By:    */s/ Glen Lenihan*
        Glen Lenihan, Esq.
        Jennifer R. Pierce, Esq.
        OVED & OVED LLP
        *Attorneys for Plaintiffs*
        401 Greenwich Street
        New York, NY 10013
        Tel: 212.226.2700
        glenihan@oved.com
        jpierce@oved.com

        NYSTROM BECKMAN & PARIS LLP
        William C. Nystrom, Esq. *(pro hac vice pending)*
        Richard G. Baldwin, Esq. *(pro hac vice pending)*
        Raquel Frisardi, Esq. *(pro hac vice pending)*
        One Marina Park Drive, 15th Floor
        Boston, MA  02210
        (617) 778-9100
        (617) 779-9110 (fax)
        wnystrom@nbparis.com
        rbaldwin@nbparis.com
        rfrisardi@nbparis.com